**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

STEPHANIE C.,[1]

|                          |                                 |
|--------------------------|---------------------------------|
| Plaintiff,               | No. 8:17-cv-00113 (BKS/TWD)     |

v.

NANCY A. BERRYHILL, Acting Commissioner of Social
Security,

Defendant.

**APPEARANCES:**

*For Plaintiff:*
Stephen J. Mastaitis, Jr.
Buckley, Mendleson, Criscione & Quinn, P.C.
29 Wards Lane
Albany, NY 12204

*For Defendant:*
Grant C. Jaquith, United States Attorney
Rebecca H. Estelle, Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.     **INTRODUCTION**

Plaintiff Stephanie C. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

review of a decision by the Acting Commissioner of Social Security denying her application for

Social Security Disability Insurance Benefits and Supplemental Security Income. (Dkt. No. 1).

The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

Court. (Dkt. Nos. 9, 11). After carefully reviewing the Administrative Record (Dkt. No. 8), and considering the parties' arguments, the Court affirms the decision of the Commissioner.

## II.      BACKGROUND

### A.      Procedural History

On July 1, 2013, Plaintiff filed an application for disability benefits alleging a disability onset date of November 13, 2012, the date she fractured a bone and injured a ligament in her right ankle. (R. 76). On September 6, 2013, Plaintiff's application was denied. (R. 76). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 3, 2015 before ALJ Carl Stephan. (R. 45–74). On May 29, 2015, ALJ Stephan issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 13–28). Plaintiff requested review of that decision by the Appeals Council on July 15, 2015, (R. 8), which denied her request for review on December 8, 2016, (R. 1–4). On February 1, 2017, Plaintiff commenced this action. (Dkt. No. 1).

### B.      Plaintiff's Hearing Testimony

Plaintiff was born on January 30, 1973, is a high school graduate, and has an associate's degree in nursing. (R. 51–53). She worked as a home health aide from 2010 until November 13, 2012,[2] when she tripped on a hose while pumping gas and fractured her ankle. (R. 55–56). Plaintiff testified that, after her injury, she worked as a substitute teacher's assistant one to three times per month. (R. 52, 54). Plaintiff testified that she experienced pain regardless of whether she was standing up or sitting down because "[k]eeping [her] leg in a dependent position is painful . . . [a]nd the pain makes [her] not be able to concentrate." (R. 58–59). Plaintiff also stated that she could only stand for "less than 30 minutes" at a time while leaning heavily on her left leg, and the only way in which she was able to relieve herself of pain was with Advil and "by

_____

[2] Plaintiff was 39 years old on the alleged onset date of her disability.

propping [her ankle] up on a pillow or elevating [it]." (R. 59–60). Plaintiff testified that she slept poorly, approximately three to four hours per night, and that she had headaches a "few times a month" that "put [her] in bed." (R. 65). She also stated that she had irritable bowel syndrome, which caused her to have diarrhea approximately three to four times per week. (R. 72–73).

### C. Medical Evidence

On November 13, 2012, Plaintiff tripped on a hose while pumping gas and sustained a bone fracture and ligament injury in her right ankle. (R. 250, 383, 434). On November 21, 2012, Dr. Andre Johnson, an orthopedic surgeon at North Country Sports Medicine, performed surgery on her right ankle to repair the damage. (R. 247–51, 436–38). Plaintiff returned to Dr. Johnson's office for a follow-up appointment on November 26, 2012, reported that she was doing "okay from the surgery," and indicated that she was "no longer taking any paid medication" because she was "not having excruciating pain or discomfort." (R. 435). Dr. Johnson noted swelling, bruising, and ecchymosis around the site of the surgery, and that Plaintiff "demonstrate[d] good small arc of range of motion with limited pain and discomfort." (R. 435). He instructed Plaintiff to "continue icing and elevating" her right ankle, and to return the following week for "removal of the surgical sutures." (R. 435).

On December 3, 2012, Plaintiff again saw Dr. Johnson and reported "that she [was] doing well." (R. 439). Plaintiff "denie[d] having any significant amount of pain or discomfort" in her ankle, and "denie[d] having numbness, tingling or paresthesias." (R. 439). Dr. Johnson "placed [Plaintiff] into a CAM walking boot" and advised that Plaintiff "continue nonweightbearing of the right ankle." (R. 439). During two subsequent follow-up appointments on December 17, 2012 and January 2, 2013, Plaintiff further indicated that she "continue[d] to do well and denie[d] having any significant amount of pain and discomfort" in her ankle. (R. 440–42). Dr. Johnson advised Plaintiff to begin physical therapy, (R. 440), which Plaintiff began shortly

thereafter. (R. 253). On February 4, 2013, Plaintiff reported that she did "not have any pain or discomfort in her ankle," but also that she had "not been placing much weight on the right ankle while in the boot." (R. 443). Dr. Johnson noted that Plaintiff had "some swelling around the right ankle" as well as "some stiffness with dorsiflexion, but that [the stiffness] has improved from her last visit." (R. 443). Dr. Johnson further noted that Plaintiff needed "to continue to improve her strength and flexibility in the ankle" and "be weightbearing as tolerated." (R. 443).

On February 26, 2013, Plaintiff visited Dr. Jennifer Stratton, her primary care physician at Hudson Headwaters Health Network, complaining of nausea and diarrhea. (R. 286–91). At that time, Plaintiff walked with crutches and reported experiencing pain levels of three out of ten. (R. 289). Dr. Stratton noted that Plaintiff appeared to be overweight, "acutely ill," anxious, and depressed. (R. 289). She diagnosed Plaintiff with infectious colitis, nocturia, mixed hyperlipidemia depressive disorder, anxiety, and benign neoplasm of the colon. (R. 291). Dr. Stratton ordered a urinalysis, referred Plaintiff to a urologist and gastroenterologist for a colonoscopy, prescribed two days of Ondansetron, increased Sertraline, and advised Plaintiff to sleep more. (R. 291). Plaintiff again saw Dr. Stratton on March 7, 2013, complaining that she had been "coughing up blood tinged sputum" and "can taste the metallic taste of blood." (R. 283). Plaintiff denied experiencing any pain, but still walked with crutches. (R. 285). Her previous gastrointestinal symptoms had subsided, but Plaintiff complained of occasional acid reflux. (R. 285). Dr. Stratton diagnosed Plaintiff with hemoptysis, viral infection, and dyspepsia. (R. 286). Dr. Stratton also ordered a chest x-ray, (R. 286), the results of which were normal, (R. 382). On March 15, 2013, Plaintiff underwent a colonoscopy, the results of which were normal except for a polyp, which was removed, and diverticula. (R. 379–80, 398).

Plaintiff returned to Dr. Johnson on March 18, 2013 for a follow-up appointment, where she complained of aching pain and weakness in her ankle. (R. 444). Dr. Johnson noted mild swelling but improved range of motion, and recommended that Plaintiff continue with physical therapy to increase strengthening of the right ankle. (R. 444). Plaintiff reported that she used "the crutch occasionally for ambulation assist, but for the most part she [was] not using any walking aids at this point in time." (R. 444).

Plaintiff continued with physical therapy, and on April 29, 2013, she reported experiencing a pain level of 2 out of 10. (R. 254). Plaintiff also indicated that she had started a weight training program despite "increased fatigue" in her right ankle as well as limping, and reported that she had been "trialing sandal use without pain." (R. 255). Plaintiff's physical therapist noted that Plaintiff used a "very poor technique" when using crutches, and also remarked that the crutches were "excessively short." (R. 253). Overall, however, Plaintiff showed "improved gait quality," increased ability to climb stairs, and improved "mobility of [right] ankle." (R. 255–56).

On May 6, 2013, Plaintiff returned to Dr. Johnson for a follow-up appointment. (R. 445). Plaintiff again reported that she had "been doing better in terms of her right ankle," but "note[d] that she is still ambulating with a limp and favoring the right ankle." (R. 445). She further stated that she "is only able to stand and do activities for around 3 hours," and that "after 3 hours, she gets a lot of swelling in [her] right ankle." (R. 445). Dr. Johnson noted that Plaintiff's fracture had "healed radiographically," but recommended further "strengthening of her right ankle" because it was his opinion that "a lot of her pain and discomfort [was] still secondary to weakness in the lower extremity, as well as loss of flexibility." (R. 446). He stated that "we will keep her out of work for around 6 more weeks and recheck her at that time." (R. 446).

At her May 29, 2013 physical therapy session, Plaintiff indicated that she had been sick and unable to complete her home exercise program for the previous two weeks. (R. 264). Plaintiff reported that her "most limiting factor is the pain she has in the right ankle and forefoot as well as the great toe limiting her progression," and the physical therapist recommended that she "continue on the land or aquatic based medium to be aggressive and progressive to maximize a return to work." (R. 264).

Plaintiff returned to Dr. Johnson for a follow-up appointment on June 14, 2013, during which she indicated that "[n]ot much ha[d] changed since her last visit" and that she "continue[d] to have pain and discomfort with ambulation." (R. 266). Plaintiff reported "swelling if she is on the foot and ankle for an extended period of time with paresthesia into the plantar aspect of her foot," as well as "pain in a band running across the anterior aspect of her ankle" and a "twitching sensation." (R. 266). Dr. Johnson recommended a "nerve conduction study and EMG study to evaluate the nerves of her right foot and ankle to make sure that she [did] not have any presence of a tarsal tunnel syndrome or nerve entrapment." (R. 266). Dr. Todd Jorgenson performed the studies on June 21, 2013, which returned "findings consistent with an intermediate dorsal cutaneous sensory neuropathy involving the right lower limb." (R. 269). Dr. Jorgenson further noted that the condition "could result in paresthesias across the dorsum of [Plaintiff's] foot" and pain, but because the nerve did "not supply any muscles," it was "therefore . . . unlikely to cause any further disability such as weakness." (R. 270).

On July 1, 2014, Plaintiff told Dr. Johnson that she was still experiencing "a lot of pain and discomfort," "mainly with pins and needles sensation over the medial aspect of the foot and ankle." (R. 454). She also complained of "hypersensitivity around the scar" and "muscle twitching and spasms in the right foot after she has been on her foot for an extended period of

time." (R. 454). Dr. Johnson noted indications "of intermediate dorsal cutaneous sensory nerve mononeuropathy" in Plaintiff's right foot, and prescribed Medrol Dose-Pak and recommended continued strengthening of the ankle. (R. 455). During Plaintiff's August 16, 2013 follow-up appointment, Plaintiff indicated that her ankle pain and discomfort had not improved. (R. 466). Dr. Johnson recommended an MRI examination to "evaluate the cartilage structures involving the right ankle." (R. 466). The MRI was normal except for a "small right ankle effusion." (R. 467).

Plaintiff returned to Dr. Johnson for a follow-up appointment on August 28, 2013. (R. 468). Plaintiff indicated that she continued to experience pain and discomfort, and that she had difficulty walking normally. (R. 468). Dr. Johnson noted that her range of motion was good, but that she "ha[d] a poor balance on the right lower extremely and she [was] unable to perform a single-toe raise." (R. 468). Dr. Johnson also reviewed the August 20, 2013 MRI and noted that it "did not reveal any evidence of tendon injury," which caused him to believe that "most of her dysfunction and pain involving the posterior tibial tendon is secondary to her gait and her walking mostly on the medial aspect of her ankle." (R. 468). He recommended that Plaintiff "focus on walking with a normal gait" and "wear some good supportive shoes and not wear sandals which do increase the stress on the posterior tibial tendon." (R. 468).

On December 4, 2013, Plaintiff returned to Dr. Johnson for a follow-up appointment. (R. 470). Plaintiff indicated that she continued to have pain and discomfort, and reported that she had "been doing exercises on her own and [her ankle] ha[d] gotten stronger. (R. 470). Dr. Johnson noted that Plaintiff was "ambulating with a more normal gait and [was] not turning her foot to the side and ambulating along her instep any longer." (R. 470). Although Dr. Johnson "advised [Plaintiff] against doing any running activities" and against doing work requiring her to

stand or walk for more than two hours during a work day, he further stated that "she is cleared to do all other forms of work especially a desk job." (R. 470). During a follow-up visit with Dr. Johnson on January 31, 2014, Plaintiff stated that "her ankle ha[d] improved with a self-instructed physical therapy program" and that she was "able to ambulate for lengthier periods of time." (R. 471). She noted increased swelling with increased activity, but she also indicated that she was "able to ambulate with a more normal gait pattern than she ha[d] been." (R. 471). Plaintiff asked Dr. Johnson to clear her to work as a substitute teacher, and Dr. Johnson noted that he thought "eventually [Plaintiff] will be able to stand and ambulate and do work for greater than three hours in time as her strength improves." (R. 471). Plaintiff resumed physical therapy shortly thereafter in February 2014. (R. 473).

On March 27, 2014, Plaintiff saw Dr. Stratton and reported increased urination and poor sleep. (R. 484). Plaintiff indicated that, after switching from Sertraline to Bupropion on January 24, 2014, she had become "more weepy" with "decreased patience." (R. 486). She reported experiencing pain at a 3 out of 10, (R. 484), and said that she had resumed exercising as part of rehabilitation for her ankle, (R. 486). Dr. Stratton indicated that Plaintiff appeared "flat/depressed" and "mildly anxious," and recommended an increased dose of Bupropion. (R. 486).

On April 25, 2014, Plaintiff visited Dr. Johnson and reported that her "ankle [was] definitely improving for her," but that she still experienced "some aching pain and discomfort" especially "after standing for extended period[s] of time with some swelling near the end of the day." (R. 473). Dr. Johnson noted that there was no swelling of Plaintiff's ankle, and that her range of motion was "excellent." (R. 473). Dr. Johnson recommended that Plaintiff continue

with her physical therapy program, and suggested that Plaintiff follow up with Dr. Johnson's office on an "as needed basis." (R. 473).

On April 29, 2014, Plaintiff visited Dr. Stratton, who noted that Plaintiff "[s]eems to be doing a little better, still some crying spells but not like [she] was." (R. 481). Plaintiff reported that she was eating better, working out, and sleeping well. (R. 481). She denied experiencing any pain. (R. 481). On August 5, 2014, Plaintiff again visited Dr. Stratton and reported that she was "down 25 lbs and feeling much better," but that her "anxiety [was] back" and that she was "very short fused." (R. 479). Dr. Stratton prescribed Effexor for Plaintiff's anxiety and ordered blood work. (R. 480).

On October 22, 2014, Plaintiff saw orthopedist Dr. Jordan Lisella for a second opinion on her continuing ankle pain. (R. 491). Dr. Lisella noted that Plaintiff had "developed some lingering discomfort and symptoms" following her November 2012 surgery, but that overall, she had done "relatively well." (R. 491). Dr. Lisella noted that Plaintiff stood "with good alignment of her feet and ankles bilaterally," but that she had "mild increased caliber right ankle compared to the left." (R. 491). He further noted that Plaintiff had "moderate tenderness and discomfort" and "good pain-free range of motion of the ankle," but "mildly decreased strength [in her] right leg compared to the left." (R. 491). Dr. Lisella concluded that "part of [Plaintiff's] discomfort is likely uncomfortable hardware and [he] think[s] surgically it is probably the only thing [he] would recommend." (R. 491). He further stated that surgery was "not going to improve any of the joint discomfort, feelings of weakness, lack of proprioception or discomfort that she has in her ankle." (R. 491).

On November 19, 2014, Plaintiff visited Dr. Stratton for a medication check and reported that she had "not felt depressed or anxious in some time." (R. 477). She reported "going out a

lot" and "starting her own business." (R. 477). Plaintiff stated that her pain was at a 7 out of 10. (R. 478). Dr. Stratton noted that Plaintiff appeared normal, except that she was overweight and had elevated blood pressure. (R. 478). Dr. Stratton diagnosed Plaintiff with an acute upper respiratory infection, as well as "[u]nspecified endocrine disorder" due to her blood work results and ordered a repeat of lab tests previously performed. (R. 479).

On February 27, 2015, Plaintiff visited Dr. Johnson's office and reported that two weeks earlier, she had fallen and re-injured her right ankle. (R. 474). Plaintiff said that her pain had worsened and was "[a]ggravated by activity, excessive use, lying down and standing." (R. 474). She indicated that her pain was at a 3 out of 10, and examination notes indicate that Plaintiff had "[n]o obvious instability of the right ankle" and that Plaintiff was experiencing "limited dorsiflexion with no pain" and "limited plantar flexion with no pain." (R. 474). An x-ray indicated that Plaintiff's "[f]racture appear[ed] well healed" and that the surgical "[h]ardware [was] in a stable position." (R. 475).

### D. Opinion Evidence

#### 1. Consultative Psychologist—Dr. Thomas Osika

On August 21, 2013, Plaintiff saw Dr. Thomas Osika, a consultative psychologist, at the Commissioner's request. (R. 456). Plaintiff indicated to Dr. Osika that she had been unable to work since she "slipped at a gas station when her leg tangled in the line to the gasoline pump" and "broke her right fibula in 3 places." (R. 457). Plaintiff also told Dr. Osika that she "feels depressed and anxious," but was not in counseling at that time. (R. 457). Dr. Osika diagnosed "[m]ajor depressive disorder secondary to leg difficulties and also generalized anxiety disorder." (R. 458). He further stated that Plaintiff "would benefit from ongoing counseling" and noted that she "had mild difficulty with simple tasks, moderate to severe difficulty with complex tasks, [and] moderate difficulty would be expected interacting with people in the workplace." (R. 458).

### 2. Consultative Psychologist—Dr. R. Petro

On August 29, 2013, Dr. R. Petro, a State Agency psychological consultant, reviewed Plaintiff's record for the purpose of making a disability determination. (R. 75–100). Dr. Petro concluded that Plaintiff had exertional limitations to the extent that she could occasionally lift objects weighing up to 20 pounds, frequently lift objects weighing up to 10 pounds, and could stand or sit for a total of 6 hours of an 8 hour workday with normal breaks. (R. 95). He further concluded that Plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions and to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 97).

### 3. Consultative Examiner—Dr. Albert Paolano

On September 4, 2013, Plaintiff visited Dr. Albert Paolano for an examination at the request of the Commissioner. (R. 459–63). Plaintiff told Dr. Paolano that she was experiencing "constant pain in the ankle," which "average[d] a 7 on a pain scale of 1 to 10." (R. 459). Plaintiff reported that she was "unable to work, especially as a nurse, due to significant limitations on standing and walking and also . . . difficulty carrying, lifting, pushing or pulling due to the instability and pain of the right ankle." (R. 460). She indicated that "sitting is not really limited," but that she "tends to be uncomfortable unless her leg is elevated." (R. 459). Dr. Paolano indicated that Plaintiff "had difficulty raising from the seated position," "ambulated with an antalgic gait," and had to "touch off of the wall quite frequently due to balance problems with the right ankle fracture." (R. 460). He further noted that, upon physical examination, Plaintiff demonstrated a normal range of motion in both ankles, "[s]trength was 5/5 bilaterally and symmetric except for the right ankle with plantar flexion and dorsiflexion due to pain." (R. 460).

#### 4. Social Worker—Janice Guay Benjamin, LCSW-R

In a letter dated "March 2015" titled "Treatment Summary for Stephanie [C.]," Ms. Benjamin stated that she had treated Plaintiff since January 2011. (R. 490). She indicated that Plaintiff's "presenting problems were major depression and relational difficulties," as well as "difficulty maintaining restorative sleep and recurrent negative thinking patters for an extended period of time." (R. 490). Ms. Benjamin indicated that Plaintiff's ankle fracture "intensified her depressive state," and that Plaintiff "experienced weight gain, lost sleep, and work due to her injury," and that "difficulty engaging in daily activities for herself and her children" further "caused [Plaintiff] a great deal of stress." (R. 490). Ms. Benjamin further indicated that Plaintiff "still attends weekly counselling and continues to manage her ongoing pain," and that Plaintiff was "studying to retake her RN boards." (R. 490).

#### 5. Treating Physician—Dr. Andre Johnson, M.D.

Dr. Johnson completed a "Physical Capacities Evaluation" dated April 27, 2015. (R. 492–93). He indicated that, in a six-hour workday, Plaintiff would be able to sit for six hours at a time. (R. 492). He further indicated that, in a six-hour workday, Plaintiff could sit or stand for thirty minutes at a time for two hours altogether. (R. 492). Dr. Johnson also opined that Plaintiff would be required to change position often to relieve pain, as well as lie down periodically. (R. 492). Dr. Johnson opined that, altogether, Plaintiff's work week "should be limited to 4 days and 6 hours per day." (R. 492). Dr. Johnson also indicated that Plaintiff could frequently lift or carry weight up to ten pounds, and occasionally lift or carry weight up to twenty-five pounds, but never more. (R. 492). He marked that Plaintiff was capable of repetitive actions with her hands and left foot, and that Plaintiff could frequently reach, occasionally bend, squat or crawl, but never climb. (R. 493). He indicated that Plaintiff was totally restricted from activities involving unprotected heights, mildly restricted from being around moving machinery and exposure to

marked changes in temperature and humidity, and unrestricted with regard to driving or exposure to dust, fumes, and gasses. (R. 493). Dr. Johnson indicated that Plaintiff's pain was "mild," meaning that it could "be tolerated but would cause some hardship in the performance of the activity which precipitates the pain." (R. 493).

### E.     The ALJ's Decision Denying Benefits

On May 29, 2015, ALJ Stephan issued a decision denying Plaintiff's claim for disability benefits. (R. 13–24). At step one of the evaluation process,[3] the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date, November 13, 2012. (R. 15). At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c) and 416.920(c), Plaintiff had five severe impairments: history of right ankle facture, intermediate dorsal cutaneous sensory neuropathy, obesity, anxiety, and depression. (R. 15–16). The ALJ also stated that Plaintiff had a number of "nonsevere" impairments, specifically: headaches, irritable bowel syndrome, and seasonal allergies. (R. 16).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. 16 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)). The ALJ stated that, taking into account "the effect of the claimants' obesity on her musculoskeletal impairments pursuant to section 1.00 of the listings and SSR 02-1p," Plaintiff's "history of right ankle fracture

---

[3] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

does not result in an inability ambulate effectively as required by listing 1.02" and "has not failed to form a solid union pursuant to listing 1.06." (R. 16). The ALJ further stated that Plaintiff's neuropathy "has not resulted in the type of motor dysfunction required by listing 11.14," and that her mental impairments "do not meet or medically equal the criteria of listings 12.04 and 12.06" because they "do not cause at least two 'marked' limitations or on 'marked' limitation and 'repeated' episodes of decompensation, each of an extended duration." (R. 17–18).

Because Plaintiff's impairments did not meet or equal a listed impairment, the ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and found that she had the capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b),[5] "except that she can occasionally climb stairs or ramps, crouch, crawl, kneel, or stoop," but that "she is precluded from climbing ladders or scaffolds or work requiring precise balance, such as unprotected heights." (R. 18). The ALJ further stated that Plaintiff "can perform unskilled work that involves simple changes in her work setting" and that "she can interact appropriately with the public, coworkers, or supervisors." (R. 18). In making these findings, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (R. 18). The ALJ also stated that he "considered

---

[4] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545 (a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." *Id*.

[5] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (R. 18).

In considering Plaintiff's alleged symptoms, the ALJ followed a two-step process: first, he determined whether there was an "underlying medically determinable physical or mental" impairment that "could reasonably be expected to produce [Plaintiff's] pain or other symptoms"; and second, after finding such impairments, he evaluated "the intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [her] functioning." (R. 18). Applying this two-step process, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms" were "not entirely credible" because the "record of medical evidence is not entirely consistent with the claimant's allegations." (R. 19).

In support of this finding and the overall RFC, the ALJ thoroughly outlined specific items throughout Plaintiff's medical and treatment history, and assigned the following weights to the various medical opinions offered:

1. The ALJ gave "great weight to the opinion of" consultative psychologist Dr. Osika "regarding the claimant's limitations for complex work," but because "the claimant [did] not allege any specific limitations in social functioning," the ALJ found that Dr. Osika's "opinion regarding the claimant's social functioning is entitled to little weight." (R. 21).

2. The ALJ accorded "great weight" to the opinion of consultative psychologist Dr. Petro because it was "supported by the record as a whole, which shows that the claimant's symptoms have generally been a reaction to stress and that these difficulties predate the alleged onset date, but do not cause pervasive depression or anxiety that would render her unable to function in a work setting." (R. 21).

3. The ALJ considered the opinion of social worker Ms. Benjamin "for the purpose of determining the claimant's residual functioning capacity," but concluded that "it was entitled to no weight" because it did "not contain an opinion regarding the claimant's ability to perform work activity or any clear assessment of the severity of the claimant's symptoms or limitations." (R. 22).

4. The ALJ accorded "significant weight" to the opinion of plaintiff's treating orthopedist, Dr. Johnson, but concluded that Dr. Johnson's "opinion regarding the claimant's limitation to working six hours per day and four days per week is not supported by the record" considering "the record since July 2013, which generally show localized tenderness and some pain on strength testing . . . as well as Dr. Johnson's statement that the claimant only experiences mild pain." (R. 21).[6]

The ALJ also identified specific inconsistencies in the record that undermined Plaintiff's allegations: (i) "claimant's reports of difficulty sitting . . . is not supported by the opinion of her treating orthopedist, who did not consider the claimant to have any restriction for sitting"; (ii) Plaintiff's "standing and walking limitations are also not credible as the record shows that the claimant has been able to lose significant weight since 2014 through exercise"; (iii) "the objective testing shows little in the way of acute findings other than the claimant's positive EMG study, which would not result in any weakness as the affected nerve does not a control a muscle"; and (iv) "[p]hysical examinations have . . . routinely shown full range of motion" with only "some mild strength deficits." (R. 22). The ALJ also noted that the extent of Plaintiff's alleged limitations was undermined by the fact that she was not seeking or utilizing treatment for her foot pain, noting that "claimant is . . . not utilizing any treatment other than over-the-counter medication," "the record shows no physical therapy since early 2013," "she has not received injections or other modalities of treatment," and there was no indication that she had "underwent removal of her ORIF hardware as suggested by Dr. Lisella." (R. 22). From these findings, the ALJ concluded that Plaintiff's "allegations regarding her physical limitations are only partly credible." (R. 22).

Accordingly, the ALJ found that, despite Plaintiff's physical limitations, she was "capable of a range of light work that involves occasional climbing of stairs and ramps, stooping,

---

[6] The ALJ did not explicitly assign a "weight" to the opinion of Dr. Paolano because he "did not . . . offer an opinion regarding the claimant's work-related limitations." (R. 21).

kneeling, crouching, or crawling," and that she was "capable of normal balance to transfer positions and ambulate effectively," but that she was "unable to climb ladders or scaffolds or perform work requiring precise balance." (R. 22). Regarding her mental impairments, the ALJ found that, because Plaintiff "did not offer any specific allegations" concerning her "imposed limitations at the hearing," the evidence indicated that she could perform "simple work that involves simple changes in her work setting, and that she can interact appropriately with others in the workplace." (R. 22).

At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work, but that "[t]ransferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (R. 22–23 (citing SSR 83-41 and 20 C.F.R. § 404, Subpart P, App'x 2)). Accordingly, at step five, the ALJ found that, considering "the claimant's age, education, work experience, and residual functional capacity," under Medical-Vocational Rule 202.21, "there are jobs that exist in significant numbers in the national economy" that Plaintiff could perform. (R. 23 (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)). Thus, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 13, 2012, through the date of this decision." (R. 23).

### F. Evidence Before Appeals Council

On May 6, 13, and 27, 2015, Plaintiff had sessions with Janice Guay Benjamin, a Licensed Clinical Social Worker at Adirondack Cross Roads Psychology. (R. 494–96). Ms. Benjamin's session notes indicate that Plaintiff appeared severely "depressed," "upset," and "irritable." (R. 494). Plaintiff also reported that she had stopped working out. (R. 494). Ms. Benjamin indicated that Plaintiff was experiencing "high" amounts of physical pain during her

May 6, 2015 session, (R. 494), but made no note of Plaintiff's pain during either the May 13 or 27, 2015 visits, (R. 495–96).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447-48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential" and the Court can reject the facts that the ALJ found "'only if a reasonable factfinder would *have to conclude otherwise*.'" *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.    Analysis

Plaintiff argues that Defendant erred in several ways in denying her claim, specifically that: (i) the ALJ erroneously concluded that "the objective medical evidence did not support the claimant's claims about pain"; (ii) the ALJ failed to give adequate weight to the opinion evidence of Dr. Johnson; (iii) the ALJ's determination of Plaintiff's RFC for light work is not supported by substantial evidence; (iv) the ALJ failed to adequately consider the effects of Plaintiff's obesity; (v) the ALJ improperly failed to consult with a vocational expert; and (vi) the

Appeals Council erred in failing to remand Plaintiff's claim based on the new evidence she submitted. (Dkt. No. 9-1, at 7–16).[7]

### 1.    Plaintiff's Testimony

"When assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 248 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529). "A claimant's statements about his condition, on their own, are not enough to establish disability." *Id.* However, a claimant's statements of pain and limitation are entitled to great weight where they are supported by objective medical evidence. *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992). If a claimant's testimony is not supported by objective medical evidence, the ALJ employs a two-step process to evaluate the claimant's reported symptoms: (1) the ALJ determines if the claimant has medically determinable impairments that could produce the alleged systems; and (2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(a); Social Security Ruling 96-7p.[8] In so doing, the ALJ considers the following:

1) the claimant's daily activities;

2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3) precipitating and aggravating factors;

4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms;

---

[7] A substantial portion of Plaintiff's memorandum of law contains arguments and addresses issues that are wholly unrelated to the facts of Plaintiff's case. (*See* Dkt. No. 9-1, at 16–28). The Court has disregarded this section of Plaintiff's submission.

[8] SSR 96-7p has since been superseded by SSR 16-3p, which became effective March 28, 2016, after the ALJ issued his decision.

5) other treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and

6) any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3)(i–vii), 416.929(c)(3)(i–vii). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Pidkaminy*, 919 F. Supp. 2d at 249. "An ALJ who rejects the subjective testimony of a claimant must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Id.* (internal quotations and citation omitted). In general, courts "afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation omitted).

At step one of the two-step process, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms." (R. 19). At step two, considering the factors described above, the ALJ then evaluated the credibility of Plaintiff's statements concerning the "intensity, persistence, and limiting effects" of the symptoms alleged. (R. 19). In evaluating the credibility of Plaintiff's testimony, the ALJ concluded that Plaintiff's allegations of pain and physical limitations were "only partly credible" because they were inconsistent with the objective testing and physical examinations conducted during Plaintiff's treatment. (R. 22). This conclusion is supported by substantial evidence in the record. Specifically, the ALJ noted that Plaintiff repeatedly denied experiencing any pain or

reported only minimal pain following her November 21, 2013 surgery, (R. 19; s*ee also* R. 254, 285, 289, 435, 439, 440–42, 443, 474, 476, 479, 481, 483, 486, 495–96), and routinely demonstrated a full range of motion in her ankle, (R. 22; *see also* R. 31, 266, 439, 440, 442, 453, 454, 460, 473). Furthermore, although Plaintiff alleged that she could only stand or walk for "less than 30 minutes" at a time and could not stand at all unless she was putting "a lot of weight on [her] left leg," (R. 59), the ALJ noted that Plaintiff had, at one point, lost at least 25 pounds through exercise, (R. 21; *see also* R. 479, 481). Plaintiff also testified that she could not comfortably sit for more than 30 minutes without elevating her foot or changing positions. (R. 58–59). As the ALJ noted, however, this was not supported by the opinion of Plaintiff's treating physician, who did not find that Plaintiff had any restrictions for sitting. (R. 22). Finally, as the ALJ noted, Plaintiff testified that she was not receiving any treatment for her ankle, other than over-the-counter medication, nor was she seeking additional treatment, such as prescription medication or additional surgery. (R. 22, 59).

The Court will not second guess the ALJ's credibility determination, since he employed the proper methodology and based his determination on specific reasons supported by substantial evidence in the record. *See Tricarico v. Colvin*, 15-3786, 2017 WL 902603, at *2, 2017 U.S. App. LEXIS 3821, *8 (2d Cir. Mar. 3, 2017) (finding that the ALJ appropriately assessed the plaintiff's credibility "given conflicting evidence in the record and in [the plaintiff's] own account of his limitations"); *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling."); *Weathers v. Colvin*, No. 15-cv-575, 2017 WL 177649, at *6, 2017 U.S. Dist. LEXIS 5944, at *17 (N.D.N.Y. Jan. 17, 2017) ("In this case, the Court will

not second-guess the ALJ's credibility finding because she identified specific record-based reasons for her ruling.").

### 2. Dr. Johnson's Opinion

Plaintiff argues that the ALJ erred in giving "*no weight* to the 4/27/15 RFC opinion of Ms. [C.]'s treating surgeon, Dr. Andre Johnson," particularly because the ALJ "failed to consider the frequency and extent of the treating relationship between Dr. Johnson and Ms. [C.]" and "failed to discuss whether Dr. Johnson was a specialist." (Dkt. No. 9-1, at 12–14).

According to the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). In other words, the treating physician's opinion is not afforded controlling weight where it is inconsistent with other substantial evidence in the record, including opinions from other medical experts. *Id*. (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). When the ALJ opts not to give a treating physician's opinion controlling weight, he must provide "good reasons" for doing so. *Id*. at 129 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). "In order to override the opinion of a treating physician, . . . the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). *See also* 20 C.F.R. § 404.1527(c).

As an initial matter, Plaintiff is incorrect that ALJ Stephan gave "no weight" to Dr. Johnson's opinion or that he failed to consider Dr. Johnson's treating relationship with Plaintiff.

On the contrary, the ALJ explicitly accorded the opinion of Dr. Johnson "significant weight" *because of* the nature and extent of the treatment relationship with Plaintiff, which was summarized at length in the ALJ's opinion. (R. 18–22). In fact, the ALJ relied heavily on Dr. Johnson's opinion in assessing Plaintiff's RFC. (R. 20–21). The ALJ did conclude, however, that two of Dr. Johnson's many opinions were unsupported by the medical evidence in the record. (R. 21). In doing so, the ALJ considered each of the other three factors described above as outlined in *Selian v. Astrue*, 708 F.3d at 418. First, the ALJ found that the record did not support Dr. Johnson's opinion that Plaintiff was limited to working six hours per day and four days per week, citing to: (i) the records of Plaintiff's physical examinations since July 2013 which "generally show localized tenderness and some pain on strength testing," but have "otherwise been within normal limits"; and (ii) "Dr. Johnson's statement that the claimant only experiences mild pain." (R. 21). Second, the ALJ found that Dr. Johnson's opinion that Plaintiff could "only stand or walk for a total of two hours in a workday" was undermined by the "rather benign medial imagining findings along with the claimant's statements . . . that she has been able to lose a significant amount of weight since 2014 through exercise." (R. 20). Accordingly, the ALJ provided adequate justification for discounting Dr. Johnson's opinions regarding limitations to Plaintiff's workweek and her ability to stand on the basis that they were not supported by the medical evidence in the record.

Finally, although the ALJ did not use the word "specialist," he acknowledged as much when he explicitly noted that Dr. Johnson was Plaintiff's "treating orthopedist" who performed "open reduction and internal fixation surgery." (R. 19). In any event, aside from the two opinions unsupported by the record described above, the ALJ ultimately accorded significant weight to Dr. Johnson's opinion and substantially adopted Dr. Johnson's other opinions in their entirety

regarding Plaintiff's ability or inability to sit, lift, carry, bend, squat, crawl, climb, or work at unprotected heights. Thus, the ALJ properly applied the treating physician rule and his assignment of "significant weight" to Dr. Johnson's opinion is supported by substantial evidence in the record.[9]

### 3. Plaintiff's RFC

Plaintiff argues that the ALJ Stephan's conclusion that she is capable of performing light work was "both medically and legally incorrect," because "[p]ain associated with the injury to the right ankle restricts [her ability to] sit and concentrate." (Dkt. No. 9-1, at 8). This argument, however, is unpersuasive.

"The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Klimek v. Colvin*, No. 15-cv-00789, 2016 WL 5322022, at *9, 2016 U.S. Dist. LEXIS 129804, at *25 (N.D.N.Y. July 21, 2016), *adopted sub nom. Klimek v. Comm'r of Soc. Sec.*, No. 15-cv-789, 2016 WL 5256753, 2016 U.S. Dist. LEXIS 129491 (N.D.N.Y. Sept. 22, 2016). "'In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient.'" *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010) (quoting *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y 1999)). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 CFR §§ 404.1567(b), 416.967(b). It requires a "good deal" of walking or standing, off and on, for a

---

[9] Plaintiff also argues that the ALJ's determination that Dr. Johnson's RFC "opinion was inconsistent with the overall record" was improper, because the ALJ, who "must attempt to reconcile inconsistent medical opinions," made no attempt to reconcile the alleged inconsistency by re-contacting Dr. Johnson." (Dkt. No. 9-1, at 15). The ALJ, however, did not discredit part of Dr. Johnson's RFC opinion due to *inconsistent* medical opinions—rather, he determined that those portions of Dr. Johnson's opinion were unsupported by medical evidence in the record. (R. 21). In any event, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,'" as ALJ Stephan did here, "the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).

total of approximately six hours in an eight-hour workday, with intermittent sitting occurring during that time. SSR 83-10, 1983 WL 31251, at *5–6, 1983 SSR LEXIS 30, at *13–14 (1983). Alternatively, a job is also considered light work "when it involves sitting most of the time but with some pushing or pulling of arm-hand or leg-foot controls." *Id.* Most jobs considered light work require only occasional, rather than frequent, stooping. *Id.*

Here, the ALJ found that Plaintiff retained the RFC to perform a range of light, unskilled work that "involves simple changes in her work setting" and requires her to "interact appropriately with the public, coworkers, or supervisors," "except that she can occasionally climb stairs or ramps, crouch, crawl, kneel, or stoop" and is "precluded from climbing ladders or scaffolds or work requiring precise balance, such as unprotected heights." (R. 18). In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence," (R. 18), but found that Plaintiff was capable of a range of light work. (R. 22).

As discussed above, substantial evidence supported the ALJ's decision not to credit (i) Dr. Johnson's opinion as to Plaintiff's workweek restrictions and standing limitations and (ii) Plaintiff's testimony regarding her pain and physical limitations. *See* Section III.B.1–2., *supra*. Evidence in the record substantially supports the remainder of Dr. Johnson's opinion—that Plaintiff was capable of performing work that required her to: sit for six hours at a time, walk or stand for thirty minutes at a time, frequently lift or carry five to ten pounds, occasionally carry up to twenty-five pounds, and use her hands and left foot without limitation. (R. 492–93). For example, as the ALJ noted, there is no indication that Dr. Johnson considered Plaintiff to have any restriction for sitting. (R. 22). And, as the ALJ found, the severity of Plaintiff's alleged walking and standing limitations is undermined by a wealth of other evidence in the record,

including objective testing after Plaintiff's surgery, (R. 270 (EMG finding that Plaintiff's condition could cause pain but not weakness); R. 445, 475 (nominal x-rays); R. 466–68 (nominal MRI); R. 31, 266, 439, 440, 442, 453, 454, 460, 473 (examinations showing good or full range of motion)), her weight loss by exercise, her daily living activities, and her frequent reports of either mild or no pain. Thus, the ALJ's RFC determination is supported by substantial evidence that "a reasonable person would find adequate to support" such a finding. *Provost-Harvey v. Comm'r of Soc. Sec.*, No. 06-cv-1128, 2008 WL 697366, at *8, 2008 U.S. Dist. LEXIS 19551, at *14 (N.D.N.Y. Mar. 13, 2008) (citing *Williams ex. Rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

### 4. Plaintiff's Obesity

Plaintiff argues that the ALJ failed to consider "obesity's functional [effect] on the claimant's severe musculoskeletal . . . gastrointestinal . . . and her . . . mental health conditions." (Dkt. No. 9-1, at 9).

According to the Regulations, obesity "is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity," and further "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. 20 C.F.R. § 404, Subpart P, App'x 1. The Regulations therefore instruct that:

> [W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

*Id.* Social Security Ruling 02-1P provides additional guidance on how adjudicators evaluate obesity in disability claims, noting, *inter alia*, that obesity can cause limitation of function, the combined effects of obesity with other impairments may be greater than might be expected without obesity, and that obesity should be factored into the RFC assessment. *See* Titles II and XVI: Evaluation of Obesity, SSR 02-1P, 2002 WL 34686281, 2002 SSR LEXIS 1 (Sept. 12, 2002).

In this case, the ALJ specifically noted "obesity" along with Plaintiff's other "severe impairments" causing "more than minimal limitation in the [her] ability to perform work-related activity." (R. 15–16). In assessing Plaintiff's RFC, the ALJ noted that Plaintiff weighed 205 pounds in September 2013, and that by April 2014 she had "reached 218 pounds, with a body mass index of 38.6" "consistent with level II obesity." (R. 20). The ALJ further noted that in August 2014 Plaintiff reported that she had lost a total of 25 pounds and in March 2015 she claimed to have lost 8 more pounds by exercising. (R. 20). Although the ALJ did not explicitly address how Plaintiff's obesity factored into his RFC determination, he nonetheless based his assessment on medical opinions and evidence that did account for Plaintiff's obesity. Plaintiff's medical records consistently indicated that she was obese and weighed up to 220 pounds. (R. 289). Plaintiff's doctors repeatedly noted that she was obese or overweight, but none indicated that Plaintiff's obesity caused or contributed to any of her alleged functional limitations. (*See, e.g.*, R. 289, 294, 308, 477–82). And Dr. Johnson, who performed surgery on Plaintiff's ankle and saw her repeatedly after the procedure, never recommended losing weight as a means of alleviating the symptoms of which she complained. (R. 434–46, 466–75). Despite Plaintiff's contention that "Dr. [Jennifer] Stratton, as well as counselor Janice [Guay] Benjamin, specifically discuss the need to lose weight in an effort to treat both her physical and mental

conditions," (Dkt. No. 9-1, at 9), the medical records do not support this assertion. Rather, they indicate only that Dr. Stratton encouraged Plaintiff's own efforts to lose weight, (R. 477–82), and that Ms. Benjamin believed that Plaintiff "experienced weight gain" after injuring her ankle, (R. 490). As noted above, the ALJ explicitly considered Plaintiff's post-injury weight gain and weight loss in his assessment of Plaintiff's RFC. (R. 20).

Thus, the ALJ considered the combined effects of Plaintiff's obesity with her other impairments as demonstrated by his thorough review of the medical opinions and evidence, which did not show any such impact. Accordingly, the ALJ did not err in addressing Plaintiff's obesity, and as discussed above, Plaintiff's RFC is supported by substantial evidence. *See Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) ("[W]e agree with the District Court that the ALJ implicitly factored Drake's obesity into his RFC determination by relying on medical reports that repeatedly noted Drake's obesity and provided an overall assessment of her work-related limitations."); *Kelly v. Colvin*, 15-cv-775, 2016 WL 5374113, at *8, 2016 U.S. Dist. LEXIS 130963, at *25 (N.D.N.Y. Sept. 26, 2016) ("Although obesity, in itself, can be considered a disability, the ALJ appropriately considered plaintiff's obesity insofar as he reviewed the limitations opined by plaintiff's physicians and took those opinions into account in rendering his RFC."); *Caron v. Colvin*, No. 12-cv-1824, 2014 WL 3107959, at *10, 2014 U.S. Dist. LEXIS 92187 (N.D.N.Y. July 8, 2014) (finding no error where the ALJ indirectly discussed the plaintiff's obesity), *aff'd*, 600 F. App'x 43 (2d Cir. 2015); *Paulino v. Astrue*, No. 08-cv-2813, 2010 WL 3001752, at *18, 2010 U.S. Dist. LEXIS 77070, at *56 (S.D.N.Y. July 30, 2010) ("An ALJ's final determination can constitute an appropriate consideration of the effects of obesity if it properly weighs evaluations by doctors that have accounted for the claimant's obesity.").

### 5. Failure to Use Vocational Expert

Plaintiff argues that, "[i]n light of the presence of *nonexertional . . .* limitations," the ALJ erred by failing to consult with a vocational expert in determining whether there were jobs in the national economy that Plaintiff could perform. (Dkt. No. 9-1, at 8).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). A nonexertional impairment "significantly limits" the range of work of a claimant "when it causes an additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 411 (internal quotation marks and alteration omitted). "If, however, a claimant does not have such limitations, the ALJ may rely on the medical vocational guidelines (the 'grids') to adjudicate the claim." *Woodmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014).

Here, the ALJ concluded that Plaintiff did not have significant nonexertional limitations that significantly limited the range of work permitted by her exertional limitations. (R. 23). Of the nonexertional impairments alleged, the ALJ found that only Plaintiff's depression and anxiety were "severe impairments" that "cause more than minimal limitation" in Plaintiff's ability to "perform work-related activity." (R. 15). The ALJ concluded, however, that these mental impairments would not "render [Plaintiff] unable to function in a work setting" because she retained the ability to "perform simple work that involves simple changes" and to "interact appropriately with others in the workplace." (R. 21–22). This determination is supported by substantial evidence in the record, particularly the opinions of Dr. Osika, who concluded that Plaintiff would have mild difficulty performing simple work, (R. 458), and Dr. Petro, who

concluded that Plaintiff was "able to maintain attention and concentration, maintain a regular schedule, and follow and understand instructions," (R. 86). Accordingly, Plaintiff's nonexertional limitations "did not result in an additional loss of work capacity . . . the ALJ's use of the Medical-Vocational Guidelines was permissible," and the ALJ was not required to consult a vocational expert. *Zabala*, 595 F.3d at 411.

### 6. New Evidence

Finally, Plaintiff argues that remand is warranted "because of the submission of new evidence." (Dkt. No. 9-1, at 16). Under 20 C.F.R. §§ 404.970(b) and 416.1470(b), a plaintiff is expressly authorized to submit new evidence to the Appeals Council without demonstrating good cause. "The Appeals Council is required to consider 'new and material' evidence if it 'relates to the period on or before the date of the [ALJ's] hearing decision' and must 'then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" *Connell v. Comm'r of Soc. Sec.*, 15-cv-1453, 2017 WL 213054, at *3, 2017 U.S. Dist. LEXIS 6453, at *6 (N.D.N.Y. Jan. 18, 2017) (alterations in original) (quoting *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)). Here, however, the Appeals Council considered the new evidence Plaintiff submitted, (R. 2), but concluded that it related to the period after the ALJ's May 29, 2015 decision. (R. 2, 29–40). The only new evidence Plaintiff submitted that relates to the period preceding the ALJ's decision are records of Plaintiff's May 2015 sessions with Janice Guay Benjamin, (R. 494–96), the contents of which indicate that Plaintiff continued experiencing the same emotional difficulties that Ms. Benjamin summarized in her March 2015 letter. (R. 490). Such evidence is not contrary to the weight of the evidence of the record, *Perez*, 77 F.3d at 45, and accordingly, the Appeals Council properly determined that the additional evidence did not warrant review of the ALJ's decision denying Plaintiff's claim.

**IV.     CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

Dated: September 24, 2018
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge